## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

IN THE MATTER OF THE SEARCH OF
THE PROPERTY LOCATED AT 18
MAPLE STREET, LEBANON, MAINE,
04027

Docket No. 2:19-mj-00330-JHR

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Justin M. Huntley, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Task Force Officer assigned to the Drug Enforcement Administration
(DEA), and have been employed in that capacity for approximately 2 years.   I am currently
assigned to the DEA's Portland, Maine Resident Office, where I investigate, among other things,
narcotics related crimes, as part of the HIDTA Task Force.

2.      During my assignment with the DEA, I have participated in numerous
investigations relating to the distribution of controlled substances, including cocaine, cocaine base,
heroin, fentanyl, methamphetamine, marijuana, and other substances in violation of the federal
anti-drug laws, including Title 21, United States Code, Section 841.  I have received training in
the field of narcotics enforcement and investigations.  I am familiar with the habits, methods,
routines, practices and procedures commonly employed by persons engaged in the trafficking of
illegal drugs.  I have been the Affiant on affidavits in support of search warrants, arrest warrants,
and other applications. I have also participated in other electronic intercept investigations. Through
my training, education, and experience, I have become familiar with the manner in which illegal
drugs are transported, stored, and distributed, and with the methods of payment for such drugs.

1

3.      The facts in this affidavit come from my personal observations, my training and experience, phone analysis, and information obtained from other agents and witnesses.

### I.      LOCATION TO BE SEARCHED

I seek search warrants to search the following location (the "Subject Premises"):

18 MAPLE STREET, LEBANON, MAINE, 04027.  The location to be searched is a single story detached trailer.  The exterior of the structure is white in color with dark brown trim.  A photograph of the building at the Subject Premises is shown below:



2

## II.    DESCRIPTION OF PROPERTY TO BE SEIZED

See Attachment A to search warrant application.

## III.    SHOWING OF PROBABLE CAUSE

### Cooperating Witness and Attempted Controlled Buy

4.    The DEA has been investigating the importation and dealing of narcotics in Western York County in Maine. Pursuant to that investigation, DEA has encountered a cooperating witness (hereinafter, "CW-1")[1], who has been providing information to the DEA since at least in or about the spring of 2019. Among other things, I learned the following information from CW-1:

a.    On a regular basis, CW-1 has purchased cocaine, MDMA ("ecstasy"), Xanex tablets and Fentanyl from DILLON GREEN. Whenever CW-1 sought these illegal drugs, GREEN had a supply of them. CW-1 understood that GREEN had an established customer base in the area of Lebanon, Maine.

b.    CW-1 has generally communicated with GREEN using the cellular telephone number 207-450-5751 (the "GREEN Cellular Phone"), including in order to arrange the purchase of illegal drugs, such as those listed above.

c.    CW-1 understood that GREEN sold narcotics out of a trailer located in Lebanon, Maine. When CW-1 was shown a picture of the Subject Premises, CW-1 confirmed that the Subject Premises was the trailer out of which GREEN operated.

---

1 CW-1 is facing drug related charges in two out of state prosecutions in Massachusetts and New Hampshire. CW-1 is cooperating with this investigation in order to receive leniency in connection with these separate prosecutions. CW-1's information has proven to be reliable in the past, and has been corroborated by, among other things, physical surveillance and witness statements.

3

5.      I know from my participation in this investigation that on or about July 12, 2019,

at the direction of the DEA, CW-1 attempted to initiate a controlled purchase of ecstasy from

GREEN.  Prior to initiating the attempted controlled drug purchase, CW-1 received a number of

instant messages from the GREEN Cellular Phone.  For example, on or about July 2, 2019, CW-

1 received the following message from the GREEN Cellular Phone:

> Bro, I have pure ass molly[.] Literally pure[.] If u can find me a 5
> or 10 pack that's fire/good/or decent.  Then ill hook u up with an
> oz for my price[.]  I get 1400.

Based on my training and experience, I understand "pure ass molly" to mean that GREEN was

selling high quality ecstasy.  I know from CW-1, that CW-1 sells marijuana, and that when

GREEN asked CW-1 for "a 5 or 10 pack," GREEN was asking CW-1 to sell GREEN marijuana.

6.      Ultimately, the controlled purchase from GREEN by CW-1 in or about July 2019

was unsuccessful because GREEN cut off contact with CW-1.

7.      I have reviewed Maine Bureau of Motor Vehicles records, from which I learned

that GREEN's residential address is listed as the Subject Premises.

### November 20, 2019 Surveillance

8.      Based in part on information provided by CW-1, on or about November 20, 2019,

the Maine State Police and members of the DEA began surveilling the Subject Premises at

approximately 10:30 am.  I participated in that surveillance.  From my participation in that

surveillance, and from speaking with Maine State Police Troopers involved in the operation, I

have learned the following:

a.      At approximately 11:00 am, a silver Hyundai with expired New

Hampshire temporary license plates arrived at the Subject Premises.  An individual ("CW-2")

4

emerged from the Hyundai and entered the Subject Premises where he remained for approximately 15 minutes. After that time, CW-2 left the Subject Premises and drove away in the silver Hyundai. At approximately 11:15 am, Maine State Police conducted a traffic stop of the silver Hyundai based on its expired temporary license plate. During the course of the traffic stop, State Troopers conducted a K-9 search of the silver Hyundai, at which time the K-9 alerted, indicating the presence of illegal drugs. At that point, State Troopers conducted a probable cause search of the vehicle and the person of CW-2, resulting in the recovery of two glycine bags of powder the Troopers believed to be heroin.

        b.     Following the recovery of the heroin from CW-2, CW-2 was arrested by the State Troopers and taken into custody. Pursuant to CW-2's arrest, State Troopers informed CW-2 of his *Miranda* rights, after which, CW-2 indicated that he wished to make a voluntary statement. CW-2 informed the State Troopers that the powder they had recovered was $150 worth of heroin that CW-2 had purchased from DILLON GREEN earlier that morning. CW-2 could not recall the address where CW-2 had purchased the heroin from GREEN, but stated it was from a trailer off of Route 202 on Maple Street. CW-2 was then shown a satellite image of the area CW-2 had indicated, at which time, CW-2 pointed out the Subject Premises as the residence where he had purchased drugs from GREEN.

        9.     Following the administration of CW-2's *Miranda* rights, I conducted a voluntary interview with CW-2 at the Sanford Police Department, from which I learned the following:

        a.     CW-2 stated that he purchased opiates from GREEN on at least 10 occasions at the Subject Premises. Over the course of those buys, CW-2 has seen crack cocaine, cocaine, and heroin at the Subject Premises. CW-2 further stated that earlier that day, GREEN

5

had cut a small amount of heroin from a golf-ball sized amount of heroin that CW-2 believed was still located with GREEN at the Subject Premises.

        b.    CW-2 was shown a photograph of GREEN, which CW-2 positively identified as DILLON GREEN.

        10.    During my interview with CW-2, CW-2 took out his cellular telephone and pointed out a series of text messages that CW-2 stated were with GREEN, and concerned the drug sale described above. I have reviewed those text messages, and from that review, I have learned that GREEN sent CW-2 text messages using the GREEN Cellular Phone. In sum and substance, CW-2 contacted GREEN at approximately 8:48 am, and asked if CW-2 could "swing by" and "give you some money." GREEN responded in the affirmative several hours later, at which time, CW-2 wrote that he was on his way.

### Securing the Subject Premises

        11.    Following the interview with CW-2, I and other members of the investigative team traveled to the Subject Premises in order to secure it while we sought a judicially authorized search warrant to search the Subject Premises for evidence of narcotics trafficking.

### TRAINING AND EXPERIENCE OF AFFIANT

        12.    Based upon my training, experience, and the training and experience of other agents with whom I have worked and spoken, I know that:

    a.   drug traffickers often store drugs in private places including in their residences, their vehicles, outbuildings, and in stash houses;

    b.   drug traffickers often possess and store firearms in their residences, their vehicles, and in stash houses in order to protect themselves, their supplies of drugs, and/or drug proceeds;

c.  narcotics traffickers must maintain, on hand, large amounts of U.S. Currency in order to maintain and finance their on-going narcotics business;

d.  it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them including their residences and their vehicles;

e.  it is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses, their vehicles, stash houses, and/or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities;

f.  narcotics traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates or business entities to avoid detection of these assets by government agencies;

g.  even though these assets are in the names of others, the narcotics traffickers actually own and continue to use these assets, and exercise dominion and control over them;

h.  it is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, electronics, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers' checks, bank checks, safe deposit box keys and money

wrappers.  These items are maintained by the narcotics traffickers within their residences, businesses, vehicles or other locations which they maintain dominion and control over;

i. when drug traffickers amass significant proceeds from the sale of drugs, they often attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize, among other mechanisms, domestic and international banks and their attendant accounts, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency. Traffickers often commingle narcotics proceeds with money generated by legitimate businesses;

j. traffickers commonly maintain books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

k. traffickers take or cause to be taken photographs of themselves, their associates, and their property.  That these traffickers usually maintain these photographs in their possession;

l. drug traffickers often use electronic equipment such as computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and or store information in furtherance of their drug trafficking activities;

m. drug traffickers often use cellular and/or portable telephones, smart phones, and other electronic equipment and data storage devices in furtherance of their criminal activities;

n. narcotics traffickers often utilize multiple vehicles in furtherance of their drug trafficking to include rental vehicles and vehicles registered in the names of third parties.

## Conclusion

13.     Based upon the information set forth above, and in light of my training and experience, I believe there is probable cause to believe the location to be searched contains evidence of drug trafficking and maintaining a drug involved premises by DILLON GREEN.


Justin M. Huntley
Task Force Officer, DEA


Sworn to and subscribed before me on this 20th day of November, 2019.


John H. Rich III
United States Magistrate Judge

9